# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Glen Armstrong,

   Plaintiff,

   v.

BNSF Railway Co.,

   Defendant.

Case No. 12 C 7962

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

This is an employment action brought under the Federal Rail Safety Act's anti-retaliation and interference with medical care provisions. 49 U.S.C. § 20109(a)(4), (c)(1). Plaintiff claims that on May 4, 2010, his supervisor assaulted him at Chicago Union Station, injuring Plaintiff's left foot and left knee. Plaintiff claims that his employer, Defendant BNSF Railway Company, delayed procuring medical care for Plaintiff after the assault and ultimately terminated him for filing an injury report. The parties now cross-move for summary judgment [82] [92] [93]. Both motions are denied.

## I. Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party, here, each party with respect to the other's motion. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

## II. Facts[1]

### A. Parties

Plaintiff Glen Armstrong is a former Conductor assigned to the Suburban Train Service for Defendant BNSF Railway Company, a railroad carrier. DSOF ¶¶ 1-2; PSOF ¶ 1. In his role as Conductor, Plaintiff also was a union member of the Brotherhood of Locomotive Engineers and Trainmen. DSOF ¶ 1.

### B. The May 4, 2010 Incident

On May 4, 2010, Plaintiff arrived at Chicago Union Station ("Union Station") a few minutes past 5:00 p.m. on a Suburban-line train with Middle Brakeman Tangie Wigley and Rear Brakeman Roy Nicholas. DSOF ¶ 7. Upon arrival, Plaintiff received a radio call from Trainmaster Christopher Motley to come to the Glasshouse. DSOF ¶¶ 6, 8; PSOF ¶ 2; 10/18/13 Armstrong Dep. at 104-05. The Glasshouse is the name given to Motley's office, and it is located between Tracks 2

---

[1] The facts are taken from the parties' Local Rule 56.1 statements and the exhibits thereto. "DSOF" refers to Defendant's statement of undisputed facts [92-2] [109-1], with Plaintiff's responses [96]. "PSOF" refers to Plaintiff's statement of facts [82-1], with Defendant's responses [94-1]. "PSOAF" refers to Plaintiff's statement of additional facts [98], with Defendant's responses [106].

2

and 4 in Union Station. DSOF ¶ 8; PSOF ¶ 2. At 5:25:58 p.m., Plaintiff arrived at the Glasshouse. DSOF ¶ 12. Motley and Conductor John Nelson (who was getting a cup of coffee) were present. DSOF ¶ 13.

What occurred in the Glasshouse is the basis of this lawsuit and largely is disputed by the parties. What is undisputed is that:

- there is video footage taken from a train resting on Track 4 that recorded a partial view of the Glasshouse during the alleged assault;

- Motley's desk, but not the area just inside the Glasshouse door, is visible in the video footage;

- the video footage shows that Plaintiff remained in the Glasshouse for 46 seconds;

- for approximately the first 30 of those seconds and until Motley asked him to leave, Nelson remained in the Glasshouse;

- Nelson then remained outside the Glasshouse door for approximately five seconds;

- Motley reprimanded Plaintiff, telling him that he was not wearing the correct summer uniform; and

- there are only four consecutive seconds of video footage where Motley is not visible in the frame and Nelson is outside the Glasshouse.

DSOF ¶¶ 9-10, 13-15, 17, 20; PSOAF ¶¶ 1, 25; 10/18/13 Armstrong Dep. at 119.

The principal dispute between the parties is whether Motley slammed the Glasshouse door on Plaintiff's left foot and left knee. Plaintiff narrates the following events. Plaintiff testified that Motley was angry, yelling and shouting at Plaintiff about his uniform. Response to DSOF ¶ 17; PSOAF ¶ 1. Plaintiff testified that Motley pointed his finger less than one foot from Plaintiff's face. PSOAF ¶ 1; 6/6/11 Armstrong Dep. at 126. Plaintiff told Motley that he was wearing an

3

authorized summer shirt, and, given Motley's behavior, also said that he would not discuss the issue further without a union representative present. Response to DSOF ¶ 17. Plaintiff attempted to leave the Glasshouse by backing out the door, and, during the four consecutive seconds when Motley is not visible in the video footage, Motley slammed the Glasshouse door against Plaintiff's left foot and left knee. DSOF ¶ 18.

Defendant disagrees with this narration. When Plaintiff stated his refusal to speak with Motley further about his uniform without a union representative present, Motley asked Plaintiff to remain in the Glasshouse to discuss the matter but Plaintiff refused. DSOF ¶ 17. Plaintiff instead left the Glasshouse, and Motley pulled Plaintiff out of service for insubordination. DSOF ¶ 17. Motley testified that he never pushed or even pressed on the Glasshouse door while Plaintiff was leaving. DSOF ¶ 22.

At 5:26:51 p.m., after Plaintiff left the Glasshouse and according to the video footage, Plaintiff passed Security Officer Rice. DSOF ¶ 24. It is undisputed that Plaintiff did not alert Security Officer Rice that he was injured or needed medical attention. DSOF ¶ 24.

Instead, Plaintiff spoke with Nelson, who also was in the area, for about one minute. DSOF ¶ 25. Plaintiff asked Nelson if he had heard what had gone on in the Glasshouse. DSOF ¶ 26. Nelson refused to discuss the subject with Plaintiff. DSOF ¶ 26. At Plaintiff's request, however, Nelson gave Plaintiff the telephone number for Union Representative Bobby Mitchell. DSOF ¶ 26. It is undisputed

that Plaintiff did not tell Nelson that Motley had slammed the Glasshouse door on his left foot and left knee. DSOF ¶ 26; Response to DSOF ¶ 26.

Plaintiff called Mitchell. DSOF ¶ 29. Plaintiff told Mitchell that Motley had slammed a door on his foot and that his foot was hurting. DSOF ¶ 30. Plaintiff did not expressly request medical care. DSOF ¶ 30. Plaintiff did request that Mitchell come to Union Station, but Mitchell (who apparently was in the Chicago suburbs) said he was unable to come downtown. DSOF ¶¶ 29, 36; 10/18/13 Armstrong Dep. at 164. Mitchell instructed Plaintiff to contact Union Representative Terry Hartwood instead. DSOF ¶ 29; 10/18/13 Armstrong Dep. at 164.

Before contacting Hartwood, Plaintiff spoke with his train crew, Wigley and Nicholas. DSOF ¶ 31; 10/18/13 Armstrong Dep. at 171. Nicholas testified that the group spoke two minutes before "we had … to leave town," perhaps referring to the Suburban-line train departing Union Station. 6/23/11 Nicholas Dep. at 7. Plaintiff told Wigley to take over as conductor because Motley had fired him. DSOF ¶ 30. It is undisputed that Plaintiff did not tell Wigley or Nicholas that Motley had slammed the Glasshouse door on his left foot and left knee. DSOF ¶ 31; Response to DSOF ¶ 31.

Plaintiff then called Hartwood. DSOF ¶ 32. The call appears to have been short. As Plaintiff began describing the alleged assault, Hartwood remarked: "Both of you guys are wrong." DSOF ¶ 32; 10/18/13 Armstrong Dep. at 165. From that comment, Plaintiff inferred that Hartwood already had spoken with Motley. 10/18/13 Armstrong Dep. at 165-66. Plaintiff ended the call with Hartwood once

Plaintiff saw Cederick Fuller, a member of the Union's Safety Committee, walk by. DSOF ¶ 32; PSOAF ¶ 2. Plaintiff had not told Hartwood that he was injured or that he required medical treatment. DSOF ¶ 32.

Plaintiff spoke with Fuller at around 5:30 p.m. PSOAF ¶ 3. Plaintiff said he had been in an altercation with Motley about his uniform and asked Fuller to be his union representative. DSOF ¶ 33; PSOAF ¶¶ 3-4. Plaintiff told Fuller that his foot hurt and that he required medical attention. DSOF ¶ 33; PSOAF ¶ 4. Fuller agreed to be Plaintiff's union representative. 12/17/13 Fuller Dep. at 44.

Also around this time, Motley called Clayton Johanson, the Terminal Manager of Suburban Operations. DSOF ¶¶ 34, 36; 9/1/11 Motley Dep. at 77. Johanson was responsible for employee safety at BNSF Railway and also investigated employee injury reports. DSOF ¶ 35. Motley and Johanson spoke for two to three minutes, DSOF ¶ 36, but the parties do not address what was said during the call. Whatever was said, Johanson took the next train from the La Grange Road Station to Union Station. DSOF ¶ 36; 6/23/11 Johanson Dep. at 27.

Motley testified that before Johanson arrived at Union Station, he saw Plaintiff on Track 4. 9/1/11 Motley Dep. at 78. Motley testified that he told Plaintiff that Johanson was coming and that Plaintiff was "going to be removed from service for insubordination." 9/1/11 Motley Dep. at 78.

Johanson arrived at Union Station at approximately 6:00 p.m. DSOF ¶ 36; PSOAF ¶ 5. Johanson first spoke with Plaintiff and Fuller; then Johanson spoke with Motley only. 12/13/13 Johanson Dep. at 65-68; 12/17/13 Fuller Dep. at 46-47.

Johanson testified that these conversations each lasted about five minutes, 12/13/13 Johanson Dep. at 65-68; Fuller testified that first conversation lasted three minutes, 12/17/13 Fuller Dep. at 47. Plaintiff gave a different estimate for the length of the second conversation. Plaintiff testified that Johanson went to the Glasshouse and stayed there to talk with Motley for 15 to 30 minutes. 10/18/13 Armstrong Dep. at 175-76. At approximately 6:15 p.m., Johanson spoke with Plaintiff and Fuller for a second time, and asked Plaintiff to complete an "Accident – Incident Interview Statement Form." PSOAF ¶ 7; 12/13/13 Johanson Dep. at 65.

There is conflicting testimony about whether Fuller, Johanson and Plaintiff discussed Plaintiff's purported injury in their first or second conversation together. Fuller testified that in the first conversation, Johanson asked Plaintiff how he felt, and Plaintiff answered that his foot hurt. PSOAF ¶ 5. Johanson responded, according to Fuller, that he would get Plaintiff medical care. 12/17/13 Fuller Dep. at 46-47. Likewise, Plaintiff testified that during the group's first conversation, he told Johanson that he had been injured in the Glasshouse and required medical attention. Response to DSOF ¶ 37; 10/18/13 Armstrong Dep. at 175; *see* PSOAF ¶ 5. Johanson, for his part, recalled asking Plaintiff if he wanted to see a doctor during the group's second conversation. 12/13/13 Johanson Dep. at 65, 68-69. Johanson recalled Plaintiff answering yes to wanting to see a doctor. DSOF ¶ 37.

After these conversations and before obtaining medical care, Johanson interviewed six employees. DSOF ¶ 6; PSOF ¶ 6; PSOAF ¶ 8; 6/23/11 Johanson

Dep. at 48; 4/25/14 Johanson Dep. at 78-89. Johanson testified that these interviews did not take "very long." 4/25/14 Johanson Dep. at 80.

Plaintiff completed the "Accident – Interview Statement Form." PSOAF ¶ 17; Accident – Interview Statement Form [98-3]. According to Plaintiff, Johanson took the completed Form and went to the Glasshouse to speak with Motley. 10/18/13 Armstrong Dep. at 177-78. Johanson then returned to see Plaintiff, and Johanson had Terminal Manager Timothy Merriweather on the telephone for Plaintiff. DSOF ¶ 6; 10/18/13 Armstrong Dep. at 178. Johanson gave the telephone to Plaintiff, and Plaintiff spoke with Merriweather. PSOAF ¶ 11; 10/18/13 Armstrong Dep. at 178. Plaintiff testified that Merriweather said: "Don't be putting in no injury report if you ain't injured. Now are you injured?" 10/18/13 Armstrong Dep. at 179-80; *see* PSOAF ¶ 11. Plaintiff answered: "Yes." 10/18/13 Armstrong Dep. at 180; *see* PSOAF ¶ 11. Plaintiff understood from Merriweather's tone that Merriweather was threatening Plaintiff if he filled out an injury report. PSOAF ¶ 11; 10/18/13 Armstrong Dep. at 179.

Merriweather testified that during the call, he asked Plaintiff how he was doing, and Plaintiff requested medical attention. Response to PSOAF ¶ 11. Merriweather testified that when Plaintiff handed the telephone back to Johanson, Merriweather told Johanson to ensure that Plaintiff received medical attention. Response to PSOAF ¶ 11.

Johanson did request medical care. Johanson called "1-800 NURSE" to make arrangements to take Plaintiff to a medical facility. DSOF ¶ 38; PSOF ¶ 5; 4/25/14

Johanson Dep. at 88-89. "1-800 NURSE" is a third-party vendor that identifies and contacts medical facilities where injured BSNF Railway employees should go. DSOF ¶ 38. "1-800 NURSE" directed Johanson to take Plaintiff to the Clearing Clinic. 12/13/13 Johanson Dep. at 70.

At an undetermined time, Johanson walked—and Plaintiff limped—to a vehicle, and Johanson drove Plaintiff to the Clearing Clinic. DSOF ¶ 39; PSOAF ¶ 12; 10/18/13 Armstrong Dep. at 188; 12/13/13 Johanson Dep. at 108-09. Johanson testified that it takes about 30 minutes to drive from Union Station to the Clearing Clinic. 12/13/13 Johanson Dep. at 79; *see* DSOF ¶ 39; Response to DSOF ¶ 39. It is undisputed that the Clearing Clinic is not the closest medical facility to Union Station. DSOF ¶ 40; PSOF ¶ 8. Plaintiff saw other medical facilities while driving to the Clearing Clinic, but he did not tell Johanson that he wished to be treated at a different facility. DSOF ¶ 41; 10/18/13 Armstrong Dep. at 189-90.

Plaintiff arrived at the Clearing Clinic at 8:02 p.m. and remained there until 9:14 p.m. DSOF ¶ 43; PSOAF ¶ 21; 1/10/14 Gorovitis Dep. at 21. Plaintiff entered the Clearing Clinic "unassisted," but limping. DSOF ¶ 43; PSOAF ¶ 12. Dr. Anatoly Gorovits examined Plaintiff and found left knee tenderness and left ankle swelling and tenderness. DSOF ¶ 42; PSOAF ¶¶ 20-21. Dr. Gorovits also x-rayed the ankle, and the x-ray showed a possible fracture. PSOAF ¶ 21. The fracture was confirmed on May 14, 2010, when a MRI revealed a talar dome fracture. PSOAF ¶ 21.

Plaintiff returned to Union Station the evening of May 4, 2010, and, as before, Plaintiff walked from the vehicle to Union Station "unassisted," yet limping. DSOF ¶ 43; PSOAF ¶ 13; 12/13/13 Johanson Dep. at 109. Plaintiff wore a brace on his left foot. Response to DSOF ¶ 43; PSOAF ¶ 15.

At Union Station, Merriweather conducted a reenactment of the alleged assault that included Plaintiff. DSOF ¶ 44; PSOAF ¶ 13. The reenactment took 20 to 40 minutes. DSOF ¶ 44. Merriweather took five photographs as part of the reenactment. PSOF ¶¶ 17, 27; PSOAF ¶ 13; 5/15/14 Merriweather Dep. at 76-77. Just prior to the reenactment, Merriweather also took a photograph of Motley holding the Glasshouse door open. PSOAF ¶ 13; 5/15/14 Merriweather Dep. at 76-77. After the reenactment, Motley, in the presence of Merriweather, told Plaintiff: "I'm sorry to see you're hurt," "I'm sorry about your foot," or something to that effect. PSOAF ¶ 14; 10/18/13 Armstrong Dep. at 162; 9/1/11 Motley Dep. at 87. Plaintiff understood this as Motley apologizing for slamming the Glasshouse door on Plaintiff's foot and knee. PSOAF ¶ 14. Also that evening, Plaintiff completed the "Employee Personal Injury / Occupational Illness Report." DSOF ¶ 45; PSOAF ¶ 17.

## C.    Investigation and Subsequent Medical Treatment

Also the evening of May 4, 2010, Merriweather called General Manager Matthew Igoe and informed Igoe of the alleged incident. DSOF ¶¶ 6, 46; 5/20/14 Igoe Dep. at 21, 46. Igoe was two steps removed from supervising Plaintiff. DSOF ¶ 6. Igoe supervised Merriweather who supervised Trainmaster Christopher

Motley who, in turn, supervised Plaintiff. DSOF ¶ 6. Apparently that same evening, Igoe called Merriweather and recommended that Merriweather have Motley report to the "Cicero yard" to be supervised by Merriweather pending an investigation. DSOF ¶ 46; 5/20/14 Igoe Dep. at 24-25.

Either the same evening or the next morning, Igoe called Director of Human Resources Duncan Brown and asked Brown to conduct a formal investigation, using the procedure outlined by the Collective Bargaining Agreement between BNSF Railway and Plaintiff's union, the Brotherhood of Locomotive Engineers and Trainmen. DSOF ¶¶ 46, 48; PSOAF ¶ 29; 5/21/14 Brown Dep. at 22; 5/20/14 Igoe Dep. at 25-26. Igoe played no role in the investigation. DSOF ¶ 49. When asked why he had Brown conduct the investigation, Igoe explained that BNSF Railways took violence in the workplace incidents seriously: "It was a workplace in the violence [sic] incident, which we take very seriously, and I wanted to make sure that any investigation was fair and impartial, so I asked the HR manager to do it." 5/20/14 Igoe Dep. at 26; *see* DSOF ¶ 46.

On May 5, 2010, Brown obtained written statements from Johanson, Motley and Nelson. PSOAF ¶ 30. Brown kept hard copies of those statements in the Human Resources Department. Response to PSOAF ¶ 30. At an unknown time thereafter, Igoe saw the May 4, 2010 video footage of the incident and determined that Motley could return to work in his normal role at Suburban Service. DSOF ¶ 47.

On May 6, 2010, Plaintiff received on-duty injury medical leave. PSOAF ¶ 18. On May 18, 2010, Plaintiff filed battery charges against Motley with the Chicago Police Department. PSOAF ¶ 19. The outcome of these charges is not in the parties' statements of facts.

On May 19, 2010, Plaintiff was seen by a second doctor: Dr. Steven Marciniak. PSOAF ¶ 22. Dr. Marciniak is an orthopedic surgeon, and he diagnosed Plaintiff with an injury to his left talus and a lateral meniscal tear in his left knee. PSOAF ¶ 22. Dr. Marciniak repaired the tear on July 19, 2010. PSOAF ¶ 22.

On or about June 17, 2010, Plaintiff, at BSNF Railway's request, wrote a six-page statement of the May 4, 2010 incident. PSOAF ¶ 17.

On October 1, 2010, Plaintiff was seen by a third doctor: Dr. Simon Lee. DSOF ¶ 69; 9/17/13 Lee Dep. at 20-21. Dr. Lee is an orthopedic surgeon, and he performed an arthroscopy on Plaintiff's left ankle. DSOF ¶ 69. Dr. Lee found bone spurs on Plaintiff's left ankle. DSOF ¶¶ 69-70.

The Collective Bargaining Agreement formal investigation hearing was initially scheduled for May 23, 2010, but postponed multiple times by mutual agreement and ultimately held on March 25, 2011. DSOF ¶¶ 52-53; PSOF ¶ 10; 3/25/11 Investigation Tr. [92-4] at 4. Randy McMahan, the Terminal Superintendent at BNSF Railway's Corwith Yard, was selected by Merriweather to serve—and did serve—as the hearing officer on March 25, 2011. DSOF ¶¶ 49, 56; PSOF ¶ 11. Years earlier, for four months in 2004, Motley and McMahan were

roommates, having rented rooms in the same house at the same time. PSOF ¶ 11;

PSOAF ¶ 37; 9/1/11 Motley Dep. at 97-98.

The March 25, 2011 hearing covered three topics:

1. Plaintiff's alleged insubordination in refusing to remain in the Glasshouse despite an instruction from Motley to do so;

2. Plaintiff's alleged dishonesty relating to his "written statement regarding an incident with Motley"; and

3. Plaintiff's alleged misrepresentation in the "Employee Personal Injury / Occupational Illness Report" as to the manner in which his alleged injury occurred.

DSOF ¶ 52. Twenty-eight exhibits were introduced at the hearing. DSOF ¶ 57.

Igoe explained that all "pertinent materials" were introduced at the hearing as

required by the Collective Bargaining Agreement. Response to PSOF ¶ 22 (citing

5/20/14 Igoe Dep. at 85). Merriweather—and not McMahan—determined what

exhibits were "pertinent" and thus introduced at the hearing. DSOF ¶ 51; 5/20/14

Igoe Dep. at 85. The following materials were not presented as exhibits at the

hearing:

- the May 4, 2010 photograph taken by Merriweather before the reenactment that depicts Motley with his hand on the Glasshouse door.

- the May 4, 2010 statement from Motley;

- the May 5, 2010 statement from Johanson; and

- the May 5, 2010 statement from Nelson.

PSOF ¶ 15.

After the hearing concluded, on April 1, 2011, McMahan sent an email to

BNSF Railway's Director of Labor Relations James Hurlburt (copying Igoe and

others) recommending that Plaintiff be terminated. Response to DSOF ¶ 61; PSOAF ¶ 38; 4/1/11 McMahan Email [101-10]. Three days later, on April 4, Hurlburt responded (also copying Igoe and others) and concurred with McMahan's recommendation. PSOAF ¶ 38; 4/1/11 McMahan Email [101-10].

In an April 5, 2011 letter from McMahan, BNSF Railway terminated Plaintiff, effective immediately, finding that the March 25, 2011 investigation hearing had revealed that Plaintiff had violated Sections 1.2.7 ("Furnishing Information"), 1.13 ("Reporting and Complying with Instructions") and 1.6 ("Conduct") of the General Code of Operating Rules. DSOF ¶ 58; 4/5/11 Termination Letter [93-12]. The termination letter listed the same three grounds that were the basis of the hearing as the grounds for termination. DSOF ¶ 59. The letter stated that Plaintiff was terminated for:

> insubordination relating to your refusal to remain in the Glasshouse Office after receiving instruction from Trainmaster Chris Motley, your dishonesty relating to your written statement regarding an incident with Trainmaster Chris Motley, and misrepresentation of information relating to your Employee Personal Injury / Occupational Illness Report as to the manner in which your injury occurred on May 4, 2010[.]

DSOF ¶ 59.

The parties dispute who made the ultimate decision to terminate Plaintiff. Defendant argues that Igoe made this decision. DSOF ¶ 62. Defendant cites Igoe's deposition testimony to argue that Igoe made the ultimate decision. DSOF ¶ 62 (citing 5/20/14 Igoe Dep. at 91). When asked if he was "responsible … for making the decision to terminate Mr. Armstrong," Igoe answered: "Yes, sir, I was." 5/20/14

14

Igoe Dep. at 91. By comparison, Plaintiff infers that McMahan made the final decision because the April 5, 2011 termination letter was electronically signed by him. Response to DSOF ¶ 62; PSOF ¶ 14; PSOAF ¶ 38; *see* 4/5/11 Termination Letter [93-12].

### D. Appeals

Plaintiff twice unsuccessfully appealed his termination. On May 6, 2011, Plaintiff appealed to Assistant Vice President of Labor Relations Milton Siegele. DSOF ¶ 63; 6/10/11 Siegele Letter [93-13]. Plaintiff claimed that he was denied a fair and impartial investigation, and that the evidence did not support the findings against him. DSOF ¶ 63. Siegele denied that appeal on June 10, 2011. DSOF ¶ 64; 6/10/11 Siegele Letter [93-13]. Sometime thereafter, Plaintiff appealed to the Public Law Board, a private dispute resolution forum. DSOF ¶ 65. On March 12, 2013, the Public Law Board denied Plaintiff's appeal too. DSOF ¶¶ 66-68. This lawsuit followed.

## III. Analysis

This Court addresses Plaintiff's retaliation and interference with medical treatment claims under the Federal Railroad Safety Act ("FRSA") in turn, and finds that there are disputed issues of material fact that warrant a trial.

### A. Retaliation Claim

Plaintiff brings a retaliation claim under the FRSA. The FRSA creates certain protections for railroad workers who report a "work-related personal injury" to the railroad carrier. 49 U.S.C. § 20109(a)(4). This claim is governed by the rules

and procedures set forth in 49 U.S.C. § 42121, part of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR–21"). *See* 49 U.S.C. § 20109(d)(2)(A).

To establish a retaliation claim under the FRSA and the AIR-21 framework, Plaintiff must show by a preponderance of the evidence that: (1) he engaged in protected activity; (2) his employer knew that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor to the unfavorable action. *Harp v. Charter Communications, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009); *see also Myles v. Northeast Illinois Regional Commuter Rail Corp.*, No. 12-7704, 2015 WL 4247811, at *3 (N.D. Ill. July 14, 2015) (citing *Harp*); *Gutierrez v. Norfolk & Southern Railway Co.*, No. 12-2396, 2014 WL 551684, at *4 (N.D. Ill. Feb. 12, 2014) (same); *Koziara v. BNSF Railway Co.*, No. 13-834, 2015 WL 137272, at *5 (W.D. Wis. Jan. 9, 2015) (same). Plaintiff's task at this initial stage is not onerous, indeed, it is less demanding than the *McDonnell Douglas* standard employed in other employment actions. *Addis v. Department of Labor*, 575 F.3d 688, 691 (7th Cir. 2009); *see also Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 159 (3d Cir. 2013); *Koziara*, 2015 WL 137272, at *5 (collecting cases). If Plaintiff establishes his *prima facie* case, Defendant nonetheless can avoid liability if it proves by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of Plaintiff's protected behavior. *Harp*, 558 F.3d at 723; *see also Gutierrez*, 2014 WL 551684, at *4 (citing *Harp*).

Here, there is no dispute that the relevant protected conduct under the FRSA is Plaintiff reporting his May 4, 2010 injury, such as through the "Accident – Interview Statement Form" and the "Employee Personal Injury / Occupational Illness Report." The parties instead file cross-motions for summary judgment on just the first and fourth elements of the *prima facie* analysis. Ultimately, however, there are disputes issues of material fact that preclude summary judgment for either party on either issue.

### 1. Protected Activity (Element 1)

The first issue in the *prima facie* analysis is whether Plaintiff acted in good faith when he reported his May 4, 2010 injury that same day. The FRSA protects an employee's "good faith act done ... to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury." 49 U.S.C. § 20109(a)(4). Courts in this Circuit (and elsewhere) interpreting this language have imposed the dual requirements that the employee (1) subjectively believe his reported injury was work-related; and (2) his belief was objectively reasonable. *E.g.*, *Koziara*, 2015 WL 137272, at *6 (collecting cases); *Gutierrez*, 2014 WL 551684, at *4; *see also Murphy v. Norfolk Southern Railway Co.*, No. 13-863, 2015 WL 914922, at *5 (N.D. Ohio March 3, 2015). The Seventh Circuit has not yet addressed the issue.

Defendant argues that Plaintiff could not have acted with good faith because he fabricated the assault with Motley. Defendant relies on (1) the video footage taken of the Greenhouse at the time of the purported assault, (2) Plaintiff's own

conduct and (3) the medical evidence to show that Motley could not have assaulted Plaintiff. This evidence, however, reveals disputed issues of material fact that preclude summary judgment for either party.

*Video footage.* Beginning with the video footage, the parties agree that the footage shows that the assault had to have occurred within a four second window when only Motley and Plaintiff remained in the Glasshouse and Motley was outside the video frame. The parties disagree whether that was enough time for the assault to occur. Defendant argues it was impossible for Motley to have assaulted Plaintiff within this short time. But Plaintiff has propounded expert testimony from Dr. Jamie Williams (a biomechanical engineer) who opined that four seconds was sufficient time for Motley to assault Plaintiff. PSOAF ¶ 28. Based on the standard maximum walking speed for adults approximately 30 years old (Motley was 33 years old at the time of the alleged assault), Dr. Williams inferred that it would have taken less than two seconds to traverse the 13 feet, leaving more than two seconds for the altercation. PSOAF ¶ 28. Defendant doubts that the brief assault could have occurred in two seconds, but that argument is for the jury to decide and not for this Court on summary judgment.

Relatedly, Plaintiff challenges the integrity of the video footage Defendant relies on because the footage has a two minute gap before the alleged assault occurred. PSOAF ¶ 26. That argument is unpersuasive based on Defendant's undisputed explanation for the gap. The video camera was mounted to a train on Track 4, and Defendant has propounded unrefuted expert testimony explaining that

video footage was not saved when, in the normal course, the train temporarily shut down its electrical system while parked in the train station.  DSOF ¶ 9; PSOAF ¶ 27.

*Plaintiff's conduct.*  Defendant argues that Plaintiff's own conduct belies his testimony that he suffered injuries, but this credibility argument does not get Defendant far at the summary judgment stage of the proceedings.  Defendant argues that Plaintiff saw at least six individuals following the purported assault, including Security Officer Rice, yet told none of them of the incident or that he required medical treatment.  That is correct, but the inference to draw from those facts is for the jury to decide.

Indeed, based on the entire record, a reasonable jury may disagree with the inference Defendant has drawn.  For example, Plaintiff immediately sought to procure representation from a union representative following the alleged assault.  DSOF ¶¶ 26, 29, 32; PSOAF ¶ 2.  Just five minutes after the alleged assault, Plaintiff told Fuller (his union representative) about the assault and that he required medical attention.  DSOF ¶ 33; PSOAF ¶¶ 3-4.  Thirty minutes later, Plaintiff and Fuller met with Johanson and, again, Plaintiff described the assault and requested medical care.  Response to DSOF ¶ 37; PSOAF ¶ 5; 10/18/13 Armstrong Dep. at 175; 12/13/13 Johanson Dep. at 65, 68-69.  It will be up to the jury to determine what inferences should be drawn from Plaintiff's behavior.

*Medical evidence.*  Defendant also argues that the injuries to Plaintiff's left foot and left knee are inconsistent with the alleged assault.  Here again, there is

conflicting factual evidence that cannot be resolved on summary judgment. Defendant has propounded a medical expert (Dr. Kris Alden) who has opined to a reasonable degree of medical certainty that Plaintiff's injuries are inconsistent with an alleged assault but consistent with pre-existing, chronic and degenerative conditions to his foot and knee. By comparison, all three doctors who treated Plaintiff reached the opposite conclusion. Those three doctors concluded—also to a reasonable degree of medical certainty—that Plaintiff's injuries were consistent with an assault on May 4, 2010. PSOAF ¶¶ 21-23. This evidence thus supports that Plaintiff had an objectively reasonable belief that he suffered a work-related injury.

Consider each treating doctor's testimony:

1. Dr. Gorovits testified to a reasonable degree of medical certainty that Plaintiff's injuries were consistent with the assault Plaintiff had described. PSOAF ¶ 21. Dr. Gorovits rendered this testimony based on: (1) his May 4, 2010 physical exam; (2) the May 14, 2010 MRI; and (3) Plaintiff's self-reported findings. 1/10/14 Gorovits Dep. at 28-30. Defendant argues that Dr. Gorovits also testified that he found evidence of arthritis (*see* PSOAF ¶ 21), yet that does negate his bottom line conclusion that the assault was the more likely cause of the fracture, indeed, the two factors can be consistent.

2. Dr. Marciniak testified to a reasonable degree of medical certainty that the injury to Plaintiff's left talus and his lateral meniscal tear were more likely than not caused by the assault. PSOAF ¶ 22. Dr. Marciniak rendered this testimony based on the acute nature of the trauma, imaging studies and Plaintiff's self-reported history. 9/23/13 Marciniak Dep. at 25-27.

3. Dr. Lee testified to a reasonable degree of medical certainty that Plaintiff's injuries were related to the assault. PSOAF ¶ 23. He also found from his medical examination that the ankle inflammation was not chronic or pre-existing. PSOAF ¶ 23. That contradicts the testimony from Dr. Alden.

Defendant correctly notes that each doctor also concluded that Plaintiff suffered some degenerative conditions, but that does not negate their bottom-line conclusions. In the end, a jury must assess the conflicting testimony at trial.

In all these respects, this case is analogous to *Koziara*, 2015 WL 137272, at *6-7, where the Court denied cross-motions for summary judgment under the first prong of the *prima facie* test. The employee in *Koziara* had fractured his tibia, and there were disputed issues of material fact as to whether the employee reported that injury in good faith. *Id.* The employee: (1) admitted that he had lied to co-workers four days after the injury, stating that he had injured his leg at home; (2) delayed reporting his injury for five days; and (3) suffered prior injuries that may have been the true cause for his fractured tibia. *Id.* at *2, 6-7. While the purported facts in support of good faith here are perhaps more compelling than in *Koziara*, because Plaintiff did not admit to lying or delay reporting any injury for days, the material facts here nonetheless remain disputed, so judgment for Plaintiff is not warranted at this stage.

For these reasons, summary judgment is not warranted for either party under the first prong of the *prima facie* analysis.

### 2. Causal Connection (Element 4)

For the final element in his *prima facie* case, Plaintiff must show a causal connection between his May 4, 2010 injury report and Defendant's adverse action, that is, the decision to terminate Plaintiff. This is a low standard for Plaintiff to meet. As the Seventh Circuit observed, Congress passed the FRSA recognizing that

"employees in the transportation industry are often best able to detect safety violations and yet, because they may be threatened with discharge for cooperating with enforcement agencies, they need express protection against retaliation for reporting these violations." *Formella v. United States Department of Labor*, 628 F.3d 381, 388-89 (7th Cir. 2010) (internal quotations omitted). Thus Plaintiff need only show that his injury report was a "contributing factor"—not the "but-for" cause—for his termination.

A contributing factor is something less than a substantial or motivating one; instead, the term means "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Addis*, 575 F.3d at 691 (internal quotations omitted); *see also Araujo*, 708 F.3d at 158; *Koziara*, 2015 WL 137272, at *9-11. Under the FRSA's "contributing factor" standard for causation, Plaintiff need not conclusively demonstrate Defendant's retaliatory motive; the contributing factor that Plaintiff must prove is intentional retaliation prompted by the employee engaging in protected activity. *Kuduk v. BNSF Railway Co.*, 768 F.3d 786, 791 (8th Cir. 2014); *accord Koziara*, 2015 WL 137272, at *9 (W.D. Wis. Jan. 9, 2015). The employer's motive can be shown, as here, through circumstantial evidence. *Myles*, 2015 WL 4247811, at *3-4; *Gunderson v. BNSF Railway Co.*, No. 14-223, 2015 WL 4545390, *8-9 (D. Minn. July 28, 2015); *Ray v. Union Pacific Railroad Co.*, 971 F. Supp. 2d 869, 885 (S.D. Iowa 2013).

One common type of circumstantial evidence district courts in this Circuit and elsewhere find compelling is evidence that the injury report initiates the events

that culminate in the adverse action taken against the employee.  *E.g.*, *Mosby v. Kansas City Southern Railway Co.*, No. 14-472, 2015 WL 44086406, at *6-7 (E.D. Ok. July 20, 2015); *Myles*, 2015 WL 4247811, at *4-5; *Koziara*, 2015 WL 137272, at *9-11; *Smith-Bunge v. Wisconsin Central, Ltd.*, 60 F. Supp. 3d 1034, 1041-42 (D. Minn. 2014); *Ray*, 971 F. Supp. 2d at 888.  This is known as the "chain of events" approach to causation under the FRSA, and evidence substantiating this approach shows that a triable issue of fact exists as to causation.

The Court in *Koziara*, 2015 WL 137272, at *9-11, for example, denied cross-motions for summary judgment based on the chain of events approach because the employee's injury report triggered the investigation that led to his suspension and later his termination.  The investigation uncovered both that the employee had been inattentive when injured and also unrelated misconduct by him—stealing railroad ties a week before the reported injury.  *Id.* at *10-11.  That theft, despite not being the trigger for the investigation, was the basis of the employee's termination.  *Id.* at *3.  The Court, also bound by Seventh Circuit law, recognized that the theft and termination had a tenuous link to the subject matter of the injury report, yet re-emphasized the expansive causal connection standard under the FRSA.  *Id.* at *10.

Another instructive case is *Ray*, 971 F. Supp. 2d at 872, which involved a railroad employee who lied to his supervisor about whether his knee injuries were work-related.  When the employee finally reported his injuries as work-related, he was fired for dishonesty and failure to timely report an injury.  *Id.*  With regard to causation, the Court found that had the employee not reported his alleged work-

related injury, then the railroad carrier would not have undertaken an investigation into either: (1) the honesty of the employee's earlier statement to his supervisor that his injury was not work-related; or (2) the timeliness of the employee's injury report, and, for those reasons, the employee would not have been terminated. *Id.* at 888.

The railway carrier in *Ray* also argued, like Defendant here, that it had "ample basis" to discipline the employee. 971 F. Supp. 2d at 885 n.19. Yet that argument missed the mark in light of the expansive causation standard. The Court found that even if dishonesty and late reporting comprised "99.9% of the reason" for the termination, the employee's FRSA claim would "still be viable because his injury report could still have been *a* contributing factor in the disciplinary action." *Id.* (internal quotations omitted and emphasis in original).

As in *Koziara* and *Ray*, among other cases, here, Plaintiff has cleared the low causation hurdle. There is a genuine issue of fact whether Defendant would have initiated the investigation that led to Plaintiff's termination had Plaintiff not reported any injury. The injury reports and commencement of the investigation are not only temporally close, but also intertwined factually. *See Araujo*, 708 F.3d at 160-62 (crediting temporal proximity to show causation); *Myles*, 2015 WL 4247811, at *4 (collecting cases for the same point). The investigation began either the same day or the day following Plaintiff reporting the alleged assault and his injury. DSOF ¶ 46. Further, two of the three bases for the March 25, 2011 investigation hearing, and for Plaintiff's termination expressly, regard the substance of Plaintiff's injury reports, that is, whether the allegations in the "Accident – Incident Interview

Statement Form" and "Employee Personal Injury / Occupational Illness Report" were truthful. DSOF ¶¶ 52, 58; 4/5/11 Termination Letter [93-12]. Similar to *Ray*, 971 F. Supp. 2d at 885 n.19, 888, had Plaintiff not made these injury reports, then the honesty of those statements could not have come under scrutiny.

Defendant argues that the investigation was triggered by Igoe watching the May 4, 2010 video footage sometime after that date—not any injury report made by Plaintiff. That is mistaken. Igoe testified that there was a single investigation, and, as shown above, Igoe instructed Brown to commence an investigation before Igoe saw the video footage. 5/20/14 Igoe Dep. at 43-44.

Perhaps Defendant also has an argument that Plaintiff still would have been terminated for insubordination in the Glasshouse. The factual basis for Defendant initiating the investigation, however, has not been extensively developed. In any event, there is deposition testimony from Igoe suggesting that the injury report was a basis for the investigation. Igoe emphasized that he asked Brown to conduct the investigation because the company took violence in the workplace allegations "very seriously." 5/20/14 Igoe Dep. at 26; *see* DSOF ¶ 26.

Even if Defendant's above arguments are credited, the evidence that Defendant held animus towards him for filing an injury report further bolsters Plaintiff's theory of causation. In this context, animus is permissible circumstantial evidence to show causation. *Davis v. Union Pacific Railroad Co.*, No. 12-2738, 2014 WL 3499228, at *8 (W.D. La. July 14, 2014); *Ray*, 971 F. Supp. 2d at 888. Plaintiff points to his May 4, 2010 call with Merriweather. Merriweather told Plaintiff "don't

be putting in no injury report if you ain't injured." 10/18/13 Armstrong Dep. at 179-80; *see* PSOAF ¶ 11. That may be an innocuous comment or, as Plaintiff understood it, a veiled threat. PSOAF ¶ 11; 10/18/13 Armstrong Dep. at 179. It also is significant that the comment came from Merriweather, because he selected the hearing officer for the March 25, 2011 investigation hearing and chose which exhibits to introduce at the hearing. DSOF ¶¶ 49, 51, 56. Merriweather thus may have had the power to influence the hearing. Plaintiff argues that Merriweather wielded that power in a biased manner, selecting a friend as the hearing officer and withholding pertinent documents from the hearing.

Plaintiff's chain of events theory and evidence of temporal proximity and animus distinguish this case from *Gunderson*, 2015 WL 4545390, at *8-13, 15, a recent decision where the Court granted summary judgment for the defendant railway carrier (also BNSF Railway) in an FRSA action based on the absence of sufficient evidence at summary judgment showing a causal connection. Unlike here, the investigation that led to the employee's termination in *Gunderson* was not triggered by the employee making a safety report, instead, the investigation there followed reports that the employee had harassed one co-worker and threatened another. *Id.* at *9-10. The employee did argue that his superior Richard Ebel was hostile to his prior injury reports, but, unlike what Plaintiff has done with Merriweather, the employee in *Gunderson* failed to show that Ebel influenced the decisions to investigate or terminate him. *Id.* at *2, 9-10. Thus *Gunderson* is inapposite to the present case.

Based on this record, Defendant cannot prevail on summary judgment as to the fourth prong of the *prima facie* analysis. Nor can Plaintiff. Drawing all inferences in favor of Defendant, which this Court must do when Plaintiff is the moving party, this Court cannot say that the undisputed evidence establishes by a preponderance of the evidence that Plaintiff's injury reports were the contributing factor behind his termination.[2]

## B.    Interference with Medical Treatment Claim

Also under the FRSA, Plaintiff can bring—and has brought—a claim for interference with medical treatment. Plaintiff has moved for summary judgment on this claim.

Section 20109(c)(1) of the FRSA imposes two requirements on railroad carriers when an employee is injured during the course of employment. First, the railroad carrier "may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment." 49 U.S.C. § 20109(c)(1). Second, if "transportation to a hospital is requested by an employee who is injured during the course of employment," the railroad carrier must promptly arrange the transportation of that employee to the "nearest hospital where the employee can receive safe and appropriate medical care." *Id.*

---

[2] Defendant last states its disagreement with the Seventh Circuit's decision in *Reed v. Norfolk Southern Railway Co.*, 740 F.3d 420, 425 (7th Cir. 2014), which held that an employee is not precluded from seeking relief under the FRSA even though he appealed his underlying grievance to the Public Law Board. [92-1] at 15. As Defendant recognizes, this Court is bound by that controlling law, and has no power or desire to revisit the Seventh Circuit's decision in *Reed*.

As a threshold matter, Defendant argues that Plaintiff is foreclosed from raising an interference with medical treatment claim now because no such claim was pled in his Complaint [1].  The Complaint includes a single count ("FRSA Cause of Action") that does not differentiate between the retaliation and interference with medical treatment claims.  Yet this Court finds that Plaintiff is not foreclosed from maintaining an interference with medical treatment claim.   Under Rule 8(a), Plaintiff must plead only enough detail to give Defendant fair notice of what the claim is and the grounds upon which it rests.  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008).  Complaints do not have to identify legal theories or point to the specific statute for relief.  *McDonald v. Household International, Inc.*, 425 F.3d 424, 427-28 (7th Cir. 2005).

Here, the Complaint gave Defendant fair notice of a potential claim for interfering with medical treatment.  In Paragraphs 10 and 12 of the Complaint, Plaintiff expressly identified two times when Defendant delayed procuring medical care:

- **Paragraph 10:** "Despite reporting his injury, Mr. Glen Armstrong remained at Union Station for approximately 3 hours.  He was required to re-enact the incident and pose for photographs, despite having reported his injury."

- **Paragraph 12:** "In seeking medical care, a railroad supervisor drove Mr. Armstrong past two emergency rooms, delaying his medical care further."

Moreover, in the section titled "FRSA Cause of Action," the Complaint states that Defendant violated Plaintiff's protected rights under the FRSA.  Complaint ¶¶ 18-

19.  These facts are enough for Plaintiff now to proceed on an interference of medical treatment theory under Section 20109(c)(1) of the FRSA.

Turning now to the merits, there are disputed issues of material fact that preclude summary judgment for Plaintiff.  Most importantly, both requirements of Section 20109(c)(1) apply only if Plaintiff was "injured during the course of employment," and, as shown above, there a genuine factual dispute whether Plaintiff was, in fact, assaulted and injured by Motley on May 4, 2010.

Even assuming that Plaintiff was injured on the job, there is also a factual dispute about when and how Plaintiff requested medical treatment, which may affect Plaintiff's claim.  *See, e.g.*, Response to DSOF ¶ 37; PSOAF ¶ 5; 10/18/13 Armstrong Dep. at 175; 12/17/13 Fuller Dep. at 46-47; 12/13/13 Johanson Dep. at 65, 68-69.  Perhaps a detailed statutory analysis of what constitutes a "delay" or "interference" with medical treatment may simplify that dispute, but Plaintiff did not engage in that analysis in his moving papers.  Nor does this Court need to engage in that analysis on its own accord, given that this Court already has found a disputed issue of fact precluding summary judgment.

For these reasons, Plaintiff's motion for summary judgment on his interference with medical treatment claim is denied.

## IV.  Conclusion

The parties' cross-motions for summary judgment [82] [92] [93] are denied. The status hearing set for September 9, 2015 at 9:45 a.m. in Courtroom 1725 stands.  At that time, the parties should be prepared to select a trial date.  In

connection with trial, Plaintiff requests that this Court exercise its discretion under Rule 56(g) and deem certain undisputed facts admitted. That request is denied. This Court will address whether undisputed facts at summary judgment should be deemed admitted at trial through its standing procedures for Pretrial Orders.

Dated: September 4, 2015

Entered:

_____
John Robert Blakey
United States District Judge